UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**UNITED STATES OF AMERICA**

**v.**                                                                 No. 1:23-CR-00038-TNM-1

**TODD TILLEY**

### DEFENDANT'S REDACTED SENTENCING MEMORANDUM

<u>BACKGROUND</u>

Todd Tilley was born in Norway, ME. He was the third of four children born to Wayne Tilley, a factory foreman and Beverly Tilley, a hospital receptionist. He was part of a close knit, loving family. He has younger brother Jay, an older brother Billy and an older sister Tammy. The family also included a half-brother and two foster children. They all went to local schools. Todd graduated from Oxford Hills High School in 1979.

He enjoyed life in a small town. He blossomed right where he was planted. He did well in school, both academically and athletically. He lettered in three sports: baseball, basketball and football. In baseball, he played outfield, right behind his younger brother Jay, who played second base. Todd and Jay loved being brothers and teammates. Sports were a huge part of their identity, of the family dynamic, and of the local culture.

After high school, Todd lived at home, worked for a year, and saved money for college. In 1980, he enrolled in Word of Life Bible Institute in Schroon Lake, NY. Eventually, he transferred to Northeastern Bible College. During college, he saved money by living in ministry housing in the Bronx and commuting to school. He played college sports, excelling at

both baseball and basketball. He was the baseball team's leading hitter, making his brother Jay quite jealous.

Both during and after and college, he worked with Beacon Baptist Church in the Bronx, NY as a youth pastor and basketball coach. Upon graduating, he became a high school teacher at another Bible school, Manhattan Bible Church.   There, he met his first wife, Annette, who was a second-grade teacher.   They got married in 1985.   They had two daughters, Grace, born in 1985, and Lauren, born in 1986.

Because Annette became pregnant out of wedlock, while working at a Christian school, both Todd and Annette lost their jobs.   As a result, Todd found work as a UPS driver. The collision of circumstance- new marriage, new job and baby on the way- became overwhelming. Todd had always turned to his religion for comfort, but now he had been banished from his religious community.   He struggled with the loss of his identity: "It rocked my world, and I didn't handle it very well."

His new marriage began to unravel, and he sought comfort in drugs, alcohol, and sex. He began drinking, smoking marijuana, and cruising the neighborhood in his car, looking for prostitutes.   Eventually, he was arrested and charged with sodomy and attempted rape against six young victims; ranging in age from thirteen to eighteen. He pled guilty and was sentenced to six to eighteen years in NY state prison. His life had completely unraveled.

In an act of amazing grace, his wife did not leave him while he was in prison.   They were able to two other children during conjugal visits, including Kristen, conceived during a conjugal visit in 1988.   Todd and Kristen would later would become very close.

In 1999, Todd was released after serving twelve years of his eighteen-year sentence. Still married but living apart from his wife, he went to a homeless shelter for a week. Later, he

found independent housing. He tried to rebuild his marriage and to maintain contact with his children.

Three months after his release, he was found in possession of a driver's license, in violation of the parole conditions. He was sentenced to an additional year in prison. He was released again in 2001. In 2004, he violated curfew conditions and was sentenced to three more months in prison. Upon his release, his parole was terminated.   Since then, he has not gone back to jail or prison.

While in prison, Todd got a Master's degree in Sociology from Skidmore College.   He hoped someday to pursue a career in the field.    But that proved more difficult than expected because of his status as a registered sex offender.    So instead, he took odd jobs.    Eventually, he landed at a printing company, where he worked as a machine operator for almost 9 years.

In 2015, his mother passed away.    His father was ailing, living in a Veterans' nursing home in Maine.    In 2016, Todd decided to move back to Maine to be closer to his dad and the rest of his family, and to make up for lost time. He got a job in construction, building houses. He met Gail Sterry. She became a huge part of his life, a "real pillar."

Todd and Gail shared the same religious and political views.    They were both anti-abortion and pro-life.    They both supported President Trump. Todd had previously encountered Donald Trump at construction sites in New York. He liked Trump's work ethic, his personality, and the nature of his family run business.

When Trump ran for president, Todd attended Trump rallies in Manchester, New Hampshire.    He enjoyed the rallies because the crowd was always, festive, patriotic, and supportive. He felt at home, among like-minded people.    He became a supporter of the America First Movement, which helped him recover his own personal sense of pride.

After the 2020 election, both he and Gail were very disappointed. From conservative media on TV, Todd learned about the rally in Washington, DC on January 6, 2021. He drove alone in his truck from Maine, arriving on in DC on 1/5/2021, hoping first to visit the Smithsonian.

Upon arrival, he was disappointed to learn that the Smithsonian was closed. So instead, he attended a rally near the Washington Monument. He spent the whole day there, from 11:00 am until darkness. He became inspired by speeches from conservative leaders and excited about the events of the next day.

On January 6, 2021, he attended the rally at the Ellipse. The highlight was President Trump's own speech. At the end, the president invited the crowd to follow him to the Capitol. While Todd had no previous plans to march on Congress, he suddenly felt an obligation to march to the Capitol as a measure and means of political protest.

Upon arrival at the Capitol, Todd encountered a chaotic scene, with a large and unruly crowd, metal barriers breached, and smoke filling the air. Stupidly, Todd followed the crowd into the Capital. He would later discuss his decision with his friend Gail, who literally screamed at him, using some very choice words. Not only did she decline to accompany him to DC, she also told him she would have dragged him away from that scene.

Once inside the Capitol, Todd found himself experiencing a mixture of emotion. He was in awe of the grandeur of the place, even amidst the maddening crowd. He came upon some uniformed building employees, huddled against a wall next to a half moon table, with fear in their eyes. Together with several others, Todd joined arms to form a protective barrier around these people. He told them, "nothing is going to happen to you." One of them responded "thank you."

Minutes later, the employees left on their own volition, Todd re-joined the crowd, participating in the "stop the steal" chants. Todd returned to Statuary Hall, where he noticed a blond-haired videographer recording the scene. He followed the videographer down a short hallway. He witnessed a man beating on the window of a door. He would later discover it was a door to the Senate Chamber.

Todd witnessed a woman swinging at the man who was beating on the window; as if to deter him. Seconds later, he witnessed this same woman being hoisted up to the window. He heard someone yell, "gun, gun." Almost simultaneously, he heard a shot.

He saw the woman, later identified as Ashley Babbitt, fall to the floor. He watched, in horror, as her lifeless body was dragged out the building, her head bouncing against the stair treads. Policemen with helmets, batons and fluorescent jackets arrived on the scene. Todd heard the commands to disperse, and quickly found the nearest exit.

The next day, he drove back to Maine, and to his life as usual. A year later, on January 12, 2022, he was getting ready for work as a flagger. Suddenly, he lost his ability to speak. His friend Gail rushed him to the hospital, where he spent the next week. He had suffered a stroke.

Todd's thirty-four-year-old daughter Kristen, who was born when he was in prison, now worked as an ICU nurse in NY. She immediately drove to Maine to assist her father and to manage his care. She brought him back to New York for a neurological consultation.

The neurologist recommended re-hospitalization, because Todd was still stroking. Todd was readmitted to another hospital. He spent another three weeks in two different facilities. He was discharged on February 11, 2022.

In early 2022, the FBI contacted Todd's brother Jay, to show him a photograph. Jay made a positive identification of Todd at the Capitol on January 6, 2021. Months later, Todd

5

was then contacted by the FBI. Through his lawyer, he arranged an off-the-record proffer. There, he fully disclosed his participation in the events of January 6, 2021. He acknowledged that he spent less than thirty minutes inside the building.

Shortly after his proffer, Todd was informed of the criminal charges. Immediately, he turned himself in. He was booked and released the same day. Since then, he has complied with conditions of release. He s remains in outpatient treatment for stroke related symptoms He continues to suffer mini strokes. He filed a successful application for social security disability.

He is pleading guilty to one count of parading, demonstrating, or picketing in a capital building. Plea and sentencing is scheduled for March 13, 2023, in front of the Honorable Trevor McFadden.

## ARGUMENT

An individual may not willfully and knowingly parade, demonstrate or picket in any of the Capital buildings. 40 U.S.C. § 5104 (e) (2) (G). Under 40 U.S.C. § 5109 (b) and 18 U.S.C. § 3561 (c), the Court has the authority to sentence the Defendant to a term of imprisonment or probation. Petty offenders are not eligible for supervised release. 18 U.S.C. § 3583 (b) (3). Under 18 U.S.C. § 3553, the Court shall impose a sentence sufficient, but not greater than necessary, to comply with various factors, including among other factors, the need for the sentence to

> (1) reflect the seriousness of the offense;
>
> (2) to afford adequate deterrence to criminal conduct;
>
> (3) to protect the public from further crimes of the Defendant, and
>
> (4) to provide the Defendant with needed educational or vocational training, medical care or other correctional treatment in the most effective manner.

The Court shall also consider the nature and characteristics of the offense and the history and characteristics of the Defendant.   Id.

Here, neither history and characteristics of the Defendant nor the characteristics of the offense suggest the need for jail time.   The Defendant has not been to jail for almost 20 years. Despite his 1987 conviction for a serious sex offense, and his status as a registered sex offender, the Defendant has lived and worked in the community, without incident, since his release from parole in 2004.   Until his stroke in January 2022, he maintained long-term gainful employment. He maintained close, loving relationships with his brother, his sister, and his children, including his daughter Kristen, whom he calls "my angel."   Since January 2022, he has been hospitalized, re-hospitalized, and determined disabled.   He continues to receive outpatient treatment and testing, monitoring his continued mini strokes.

Nor do the other § 3553 factors suggest jail time.   The Defendant entered the building at 2:24 p.m. and exited at 2:53 p.m.   His presence and participation were limited.   Under these circumstances, it is not necessary to sentence him to jail to reflect the seriousness of the offense, to promote respect for the law, or to provide just punishment.

Even while breaking the law, he tried to assist others, by forming a protective barrier around them.   It is not necessary to jail him to afford adequate deterrence to criminal conduct or to protect the public from further crimes.   He is now a disabled stroke victim.   It is not necessary to put him in jail, where he cannot receive ongoing medical care in the most effective manner.

Unlike numerous others, Todd did not enter the Senate Gallery or Chamber. He dispersed upon police command.   CF. US v. Little, 590 F. Supp. 3d 340 (D.D.C. 2022). (a sentence of 60 days imprisonment and 36 months of probation warranted by the circumstances,

7

including lack of remorse, entry into Senate Gallery, one of the Capitol's most sensitive areas). He left the building, left the city, and returned to his normal life.

He has expressed remorse, through word and deed. Once confronted, he took full responsibility. His cooperation began even before his arrest, with an off the record proffer. He identified himself in time stamped photos of the scene. He answered every question honestly. He apologized for his behavior and regretted his decision.

Once criminally charged, he turned himself in. He was bailed the same day. He walked across town to retrieve his vehicle at his lawyer's office. He drove home with a sense of relief, safe in the embrace of his family and friends. Since his release, and despite his medical condition, he has performed community service at the Harrison Food Pantry.

This is serious offense, but this Defendant's role in the offense was minimal. He got carried away by the energy of the raucous crowd. He got carried away by the political rhetoric. He got carried away by the idea that he was witness to history. He returned to Maine and returned to earth. Since then, he has worked to take ownership of his actions, to express his remorse, and to repay his debt to society.

## CONCLUSION

The Defendant should be sentenced to a fine, community service and restitution.

DATED: March 9, 2023   /s/ *Robert A. Levine*

                                                           Robert A. Levine, Esquire
Bar #3845
Attorney for Defendant
17 South Street
Portland, ME   04101
(207) 871-0036

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of March, 2023, I filed the foregoing Defendant's Redacted Sentencing Memorandum by the Court's CM/ECF system. All case registered parties will be served by CM/ECF.

DATED: March 9, 2023              */s/ Robert A. Levine*

                                                                                                                   _____
                                                                                                                    Robert A. Levine, Esquire
                                                                                                                    Bar #3845
                                                                                                                    Attorney for Defendant
                                                                                                                    17 South Street
                                                                                                                    Portland, ME    04101
                                                                                                                    (207) 871-0036