# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:23-cr-38 (TNM)** |
| **v.** | : | |
| | : | |
| **TODD TILLEY,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Todd Tilley to 14 days of incarceration and a 36-month term of probation, 60 hours of community service, and $500 in restitution.

## I.    Introduction

Defendant Todd Tilley, 61, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than $2.8 million in losses.[1]

Defendant Tilley pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G). As explained herein, a sentence of 14 days of incarceration and a 36-month term of probation is

---

[1] Although the Statement of Offense signed by the parties reflects a sum of more than $1.4 million for repairs, as of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20, which is accurately reflected in Section 11 of the Plea Agreement. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

appropriate in this case because Tilley (1) approached the Capitol through a battle scene on the West plaza just as the building was overrun by rioters; (2) entered the Capitol through the Senate Wing Doors less than 15 minutes after its initial breach, as other rioters continued to enter through broken windows on each side of the door; (3) joined a crowd of rioters chanting "stop the steal" in a Capitol hallway, (4) remained in the Capitol for approximately 30 minutes before exiting, and (5) had a criminal record and was in violation of his state's sex offender registry law on the date of his arrest in June 2022. The government's recommendation nonetheless also reflects that, upon learning that federal agents wanted to speak with him about January 6, Tilley retained counsel and quickly took responsibility for his actions.

The Court must also consider that Tilley's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Tilley's crime support a sentence of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021, Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 1-1 (Statement of Facts), at 1-2.

### Defendant Tilley's Role in the January 6, 2021, Attack on the Capitol

Tilley travelled from his home in South Paris, Maine, to Washington, D.C., via automobile on January 5, 2021. One of the purposes of his trip to Washington, D.C., was to protest Congress' certification of the Electoral College votes from the November 2020 presidential election. On January 6, 2021, Tilley watched speeches at the rally near the ellipse and then marched with others to the U.S. Capitol building. Prior to entering the U.S. Capitol, Tilley observed other rioters

attempting to scale walls to gain entrance to the building and assisted one rioter by pulling him safely over the top of one of the walls. (Figure 1).



*Figure 1: Tilley assisting wall climber*

Tilley also observed other rioters battling with law enforcement who were trying to keep the crowd from reaching the building. Tilley saw smoke, smelled pepper spray, and heard sirens and loudspeakers warning him that he was in a restricted area.

Tilley entered the first floor of the Capitol through the Senate Wing Doors on the west side of the building at approximately 2:24 p.m., roughly 12 minutes after the first breach of the building. At the time Tilley entered, other rioters were entering the building through the broken windows on each side of the doors. (Figure 2).



*Figure 2: Frame from CCTV of interior of Senate Wing Doors at approximately 2:24 p.m.*

Tilley entered the Crypt from the north and walked near the Memorial Door to the south of the Crypt where he and other rioters were turned back by law enforcement. (Figures 3 and 4).



*Figure 3: Frame from CCTV of Memorial Door*



*Figure 4: Frame from CCTV of Memorial Door*

Tilley then walked through Statuary Hall on the second floor of the Capitol and passed through the Statuary Hall Connector where he was captured in the Jayden X video.[2] (Figure 4).



*Figure 5: Frame from Jayden X video, clip time 27:49*

---

[2] The video is archived at https://archive.org/details/nYiFQbNc65jwFYCWY (last accessed March 9, 2023).

Tilley then joined with the other rioters in shouting, "Stop the steal!" in the hallway. (Figure 6).[3]



*Figure 6: Frame of public source video of Tilley shouting, "Stop the steal!"*

Tilley continued walking inside the Capitol near the Upper House Door before exiting the Capitol through the East Front House Door at approximately 2:53 p.m., nearly 30 minutes after he entered. (Figures 7 & 8).



*Figure 7: Frame from CCTV of Upper House Door Interior*

---

[3] The video of Tilley chanting "Stop the steal!" is available at https://youtu.be/V3KpiJzBM6M?t=3579, clip time 1:00:04 (last accessed March 9, 2023).



*Figure 8: Frame from CCTV of East Front House Door at approximately 2:53 p.m.*

Later that evening, Tilley sent his brother a text message with a photo of a large crowd gathered near the Washington Monument. Tilley's brother asked, "Are you there?" Tilley responded, "Yes. Pence screwed us over." (Figure 9).



*Figure 9: Screenshot of Text Message Conversation between Tilley and his brother*

7

*Tilley's Interview*

In 2022, aware that federal agents were attempting to locate him, Tilley retained counsel. On May 27, 2022, Tilley was interviewed in the presence of his attorney pursuant to a written proffer agreement.[4] During the interview, Tilley indicated that he was still experiencing some problems with his memory as a result of a stroke he suffered in mid-January 2022.[5] However, he appeared to be otherwise fully alert, conversant, and fluid in his speech and movement. Tilley was cooperative during the interview and circled himself in several images from Capitol CCTV footage that were presented to him. With one exception, Tilley appeared to be truthful. During the interview Tilley denied chanting or shouting, "Stop the steal," while in the Capitol building. However, the government was unable to determine whether Tilley was deliberately being untruthful about this fact, or whether he sincerely could no longer remember joining in the chant as a result of his stroke, the passage of time, or for another reason.

Tilley was adamant that he did not join in the "stop the steal" chant in the Capitol building and that doing so would have been "wrong." Tilley explained that, although he wanted his preferred presidential candidate to have won the 2020 election, he wanted that result legally and fairly and thus "did not agree with" others who were chanting "stop the steal." Tilley explained that it seemed to him like those people "had an agenda to get in there and to try to force their will

---

[4] Pursuant to the terms of Tilley's guilty plea agreement, the parties agreed that the government was free to use any information provided by Tilley during the interview at sentencing. Guilty Plea Agreement, Section 10.

[5] Based on medical records that Tilley provided to the government, it appears that he was hospitalized for a stroke on January 12, 2022, and that he spent the next several months undergoing treatment and rehabilitation.

and I just don't agree with that." Tilley was not shown the video of him chanting "stop the steal" at that time.[6]

*The Charges and Plea Agreement*

On June 16, 2022, the United States charged Tilley by criminal complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On June 21, 2022, Tilley self-surrendered to the FBI in Portland, Maine. On February 1, 2023, Tilley and the government entered into a plea agreement pursuant to which Tilley agreed to plead guilty to one count of parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) as charged in Count Four of a four-count Information that was filed on February 2, 2023. By plea agreement, Tilley agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Tilley now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the Plea Agreement, he faces up to six months of imprisonment and a fine of up to $5,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; USSG §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the

---

[6] Following the interview, the government directed Tilley's counsel to the public source video of Tilley chanting (https://www.youtube.com/watch?v=V3KpiJzBM6M&t=3602s). Tilley no longer denies that he chanted "Stop the steal" in the Capitol. *See* Statement of Offense, ¶ 11.

defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of 14 days of incarceration and a 36-month term of probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Tilley's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Tilley, the absence of violent or destructive acts is not a mitigating factor. Had Tilley engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Tilley's case is that Tilley entered and remained in the Capitol Building for nearly 30 minutes despite visual, auditory, and olfactory warnings that he should not have entered (i.e., seeing officers battling rioters, seeing smoke, smelling pepper spray, and hearing sirens and loudspeakers warning him that he was a restricted area).

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of 14 days of incarceration and a 36-month sentence of probation in this matter.

B.        The History and Characteristics of Tilley

Tilley, age 61, has multiple prior arrests and convictions, as follows:[7]

- On 7/3/80, Tilley (age 19) was charged in Oxford, Maine, with criminal trespass. On 7/15/80, the disposition was "filed without costs."

- On 1/19/86, Tilley (age 24) was charged in Bronx County, New York, with attempted rape, robbery, assault, sexual abuse, unlawful imprisonment, and criminal possession of a weapon.[8] On 1/21/87, he pled guilty to all charges. On 1/21/87, he was sentenced to 2 to 6 years on the rape and robbery convictions and given an unconditional discharge on the other convictions.

- On 2/2/86, Tilley (age 24) was charged in Bronx County, New York, with kidnapping, attempted rape, robbery, sexual abuse, and criminal possession of a weapon.[9] The NCIC report lists "Not arraigned" for the kidnapping and attempted rape charges, but no disposition for the other charges.

- On 11/6/86, Tilley (age 25) was charged in Bronx County, New York, with kidnapping, sexual abuse, acting in a manner injurious to a child less than 16, and criminal possession of a weapon.[10] On 1/21/87, he pled guilty to sodomy, sexual abuse, unlawful imprisonment, criminal possession of a weapon, and public lewdness. On 1/21/87, he was sentenced to 2 to 6 years on the sodomy conviction, 1 year on the sexual abuse conviction, and given an unconditional discharge on the other convictions.

- Between 1998 and 2004, Tilley (ages 37 to 43) was under parole supervision. (This suggests that the sentences for the offenses listed above were imposed consecutively.) During this time, Tilley had multiple parole violations, and at least one new commitment.

- On 12/1/19, Tilley (age 57) was charged with failing to comply with Maine's Sex Offender Registration Act (1st offense). On 7/30/2020, he was found guilty and fined $500.

- On 1/27/20, Tilley (age 58) was charged with failing to comply with Maine's Sex Offender Registration Act and violating a condition of release. On 7/30/20, the case

---

[7] No Presentence Investigation Report was ordered in this case. The criminal history listed above is based on NCIC and Criminal History Record reports, which list data in very summary form.

[8] Cycle 1, Tracking Number 9723003, Court Case Number 01002-86.

[9] Cycle 2, Tracking Number 9956309Q, Court Case Number 6X007370 (kidnapping and rape charges only; no court number listed for the other charges).

[10] Cycle 3, Tracking Number 10135849H, Court Case Number 05899-86.

was disposed with the notation "Dismissed by D.A./A.G. – pled to other charge"; presumably, the "other charge" was his 2019 arrest for the same offense.

In the instant case, the FBI had some trouble locating Tilley in 2022 because he was not living at the address listed in the sex offender registry.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.   The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Tilley entered the Capitol shortly after its initial breach, despite witnessing violence, seeing smoke, and hearing alarms, and he remained inside, undeterred by what he witnessed there. Moreover, he has a serious criminal record that includes two recent violations of his state's sex offender registration law, and was again in violation of that law in June 2022, when he was arrested on charges in this case. Although Tilley promptly took responsibility for his actions in this case when confronted by law enforcement and video evidence, it is clear that there is a need to deter him from further unlawful conduct.

**E.      The Need to Avoid Unwarranted Sentencing Disparities**

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[11] This Court must sentence Tilley based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Tilley has agreed to plead guilty to Count Four of the Information charging him with one count of parading, demonstrating, or picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like

---

[11] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences." Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the

discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum

of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case:

### *United States v. Suzanne Ianni*, 1:21-cr-45 (CJN)

The court sentenced the defendant to 15 days' incarceration, where the defendant, a 60-year-old former electrical engineer, led rioters in chants of "fight for your rights" and "our house"; entered the Capital through the fire door near the Senate Parliamentarian's Office, mere feet away from rioters who were breaking doors and windows to enter at the Senate Wing Door; and was part of a group of rioters that confronted and eventually overwhelmed officers who were trying to prevent a further breach of the Capital. In total, Ianni spent 23 minutes inside the Capitol. Subsequently, Ianni fundraised off her participation in the riot, minimizing the events of January 6. Unlike Ianni, Tilley did not confront police, nor did he attempt to fundraise from his crime, but unlike Ianni, Tilley as a prior criminal record.

*United States v. Scirica*, 1:21-cr-457 (CRC)

The court sentenced the defendant to 15 days' incarceration, where the defendant entered the Capitol despite seeing a broken window and hearing alarms; led rioters through Statuary Hall in the direction of the House Chamber, because "that must be the place towards where the electors are"; chanted "USA" at police in the hallway leading to the House Chamber doors and watched as other rioters pushed against police until the line broke; remained in the Capitol for 31 minutes, despite witnessing violence; and did not express remorse for his conduct, instead telling the FBI that it might make a good story when he was a grandfather. Unlike Scirica, Tilley's chanting in the Capitol was not directed at the police or at finding the electors, but also unlike Scirica, Tilley has a criminal record.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[12]

## V.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days of incarceration and a 36-month term of probation, 60 hours of community service, and $500 in

---

[12] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,
MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:  */s/ Douglas B. Brasher*
DOUGLAS B. BRASHER
Assistant United States Attorney
Texas State Bar No. 24077601
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8604
douglas.brasher@usdoj.gov

*Detailed to the U.S. Attorney's Office for
the District of Columbia*